REISSUED FOR PUBLICATION
MAY 13 2020
OSM
U.S. COURT OF FEDERAL CLAIMS

# In the United States Court of Federal Claims

## OFFICE OF SPECIAL MASTERS

```
* * * * * * * * * * * * * * * * * * * *
LARRY EDGE,                    *
                               *    No. 17-1283V
            Petitioner,        *    Special Master Christian J. Moran
                               *
v.                             *
                               *    Filed: March 31, 2020
SECRETARY OF HEALTH            *
AND HUMAN SERVICES,            *
                               *    Attorneys' fees and costs,
                               *    reasonable basis.
            Respondent.        *
* * * * * * * * * * * * * * * * * * * *
```

Larry Edge, pro se, Astatula, FL;
Petitioner previously represented by Franklin J. Caldwell, Jr. and Jessica Olins,
Maglio, Christopher & Toale, PA., Sarasota, FL;
Camille M. Collett, United States Dep't of Justice, Washington, DC, for
respondent.

## PUBLISHED DECISION DENYING PETITIONER'S MOTION FOR ATTORNEYS' FEES AND COSTS[1]

Mr. Edge alleged the influenza and pneumococcal vaccine caused him to suffer chronic inflammatory demyelinating polyneuropathy ("CIDP"). Pet., filed Sept. 18, 2017. When Mr. Edge submitted his petition, Franklin Caldwell represented him. Approximately fifteen months after Mr. Caldwell had filed the petition, Mr. Caldwell anticipated withdrawing from the case.

---

[1] The E-Government Act, 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services), requires that the Court post this decision on its website. This posting will make the decision available to anyone with the internet. Pursuant to Vaccine Rule 18(b), the parties have 14 days to file a motion proposing redaction of medical information or other information described in 42 U.S.C. § 300aa-12(d)(4). Any redactions ordered by the special master will appear in the document posted on the website.

Before filing a motion for withdrawal, Mr. Caldwell filed a motion requesting an award of attorneys' fees and costs on an interim basis. In response, the Secretary argued that Mr. Edge had not made a special showing to justify an interim award of attorneys' fees and costs but did not state a position on whether Mr. Edge's petition had reasonable basis. Mr. Edge filed a reply to provide a justification for an interim award. Mr. Caldwell subsequently withdrew as counsel.

On January 24, 2020, the undersigned issued a decision denying compensation for Mr. Edge's petition for failure to prosecute and insufficient proof. This action makes the previously filed motion for attorneys' fees and costs ready.

Based upon a review of the facts in the petition, the undersigned finds that Mr. Edge never possessed a reasonable basis for pursuing a claim that he was injured as a result of a vaccination. Accordingly, he is not eligible for an award of fees and costs and the March 27, 2019 motion is DENIED.

## I.   <u>Factual History</u>

The undersigned has reviewed all the medical records but presents a tailored medical history to focus on the reasonable basis issue. In particular, medical records related to diagnosis and the opinions of Mr. Edge's treating physicians regarding vaccine causation are highlighted below.

### A.   **Medical History before Vaccinations**

In his petition, Mr. Edge characterized his pre-vaccination condition as an "ongoing diabetes-related neuropathy." Pet. at 1. In his damages affidavit, Mr. Edge stated that he "did not have any recurring health problems" before the vaccination. Exhibit 11.

On August 28, 2015, Mr. Edge presented to an emergency room with complaints of two painful blisters on his left foot that had developed into a hole. Exhibit 5 at 132-35. He reported tingling and numbness in his lower extremities and hands with observed swelling in his lower extremities. Id. at 129-30. Mr. Edge denied a history of diabetes mellitus and asserted that "he did not know about [his diabetes] until now." Id. at 132, 135-36. Mr. Edge admitted that he had not visited a doctor in more than ten years. Id. at 132. The ER physician noted that his entire immediate family had diabetes: his mother, father, and all his brothers, sisters, and children. Id. at 129. The impression was acute cellulitis of the left

foot, diabetes with neuropathy, and thrombophlebitis (left upper extremity).  Id. at 128, 131.  Mr. Edge was admitted for further treatment.  Id. at 131-35.

During his admission, Mr. Edge had three surgical procedures performed on his left foot.  Exhibit 5 at 145-146.  Testing confirmed that the second toe was gangrenous.  Id. at 181.  The doctors eventually had to amputate his second toe. Id. at 142-44.  Mr. Edge was discharged on September 11, 2015, with prescriptions for numerous medications.  Id. at 127-28.[2]

At a post-operative visit on September 16, 2015, Mr. Edge complained of weakness, fatigue, numbness in the feet, joint pain, motor or sensory loss, and paresthesia.  Exhibit 3 at 19.  After a physical exam, the physician recorded no reflexes in the bilateral knees and ankles, absent sensation to pinprick in the toes to rear foot, reduced vibratory sensation at the great toe, and negative sensation with monofilament.  Id. at 20. The impressions included diabetes mellitus with peripheral sensory neuropathy.  Id. at 21.

At a follow-up visit on September 30, 2015, Mr. Edge stated that his neuropathy pain had improved with medication but still reported numbness in his feet and paresthesia.  Id. at 10-11.  A physical exam again recorded reduced or absent reflexes and sensation in Mr. Edge's lower extremities.  Id. at 12.

## B.    Medical History after Vaccinations

Mr. Edge received the influenza vaccine on October 2, 2015, during his follow up with Dr. Carlos Chang.   Exhibit 9 at 28-29; exhibit 6 at 1.  Mr. Edge questioned the continued use of his blood pressure medication.  Exhibit 9 at 28.

Four days later, Mr. Edge returned to Dr. Chang complaining of episodic dizziness.  Id. at 26-28.  Mr. Edge presented a log documenting low blood pressure and stated that he had not taken his blood pressure medication that morning.  Id. at 26.

At his next appointment with Dr. Chang on November 2, 2015, Mr. Edge received the pneumococcal vaccine.  Exhibit 9 at 23.  He reported high blood sugar levels regardless of his diet.  Id.  Dr. Chang adjusted the medications for Mr. Edge's pain and blood sugar.  Id. at 25.

---

[2] During his hospitalization, because his last tetanus vaccine was unknown, Mr. Edge received a tetanus-diphtheria booster.  Exhibit 8 at 3.  Mr. Edge did not allege that he suffered any adverse reaction to the tetanus-diphtheria booster vaccine.

At a November 4, 2015 appointment to follow up on his foot surgeries, Mr. Edge stated that his neuropathic pain had improved with medication and that his blood sugars were under control.  Exhibit 3 at 2.

On November 9, 2015, Mr. Edge reported to Dr. Chang that he had not been feeling well and had trouble sleeping since the pneumococcal vaccine.  Exhibit 2 at 25.  Mr. Edge told Dr. Chang that on the day following the vaccine, November 3, 2015, he had difficulty raising his arm and then later developed difficulty walking with odd "numb" back pain.  Id.  He also had pain in the left lower abdomen that was so severe the night before that he considering going to an emergency room. Id.  He stated that his pain medication was almost ineffective with his current symptoms.  Id.  In response, Dr. Chang ordered a CT of Mr. Edge's abdomen and pelvic region.  This CT failed to reveal a source of his pain.  Id. at 24, 38.

Mr. Edge went to an emergency room on November 22, 2015, complaining of a progressive worsening of chest, upper back, abdominal, and lower back pain over the previous three weeks.  Exhibit 5 at 92.  Mr. Edge stated that all the symptoms occurred after the pneumococcal vaccination.  Id.  After a chest CT revealed a moderately sized zone of airspace disease, Mr. Edge was diagnosed with pneumonia and admitted to the hospital.  Id. at 95.  Considering Mr. Edge's intractable back and abdominal pain, Dr. Stephen Young stated that he "doubt[ed] the symptoms [are] secondary to vaccine reaction."  Id. at 91.  Later during Mr. Edge's hospital stay, Santiago Calderon, an infectious disease specialist, opined that he was suffering from pneumonia, "high suspicion for the neuropathy likely related to his diabetes," and "suspected possibility of reaction to pneumonia vaccination."  Id. at 99.

On November 24, 2015, Mr. Edge saw Sampathjumar Shanmugham, a neurologist.  Dr. Shanmugham opined that the peripheral neuropathy was "most likely due to diabetes mellitus."  Id.  He added that "preexisting diabetic neuropathy can get worse after any type of peripheral nerve insult, but [Mr. Edge] does not have ascending symptomatology to suggest that."  Id.

At his discharge, Mr. Edge's upper/lower back and abdominal pain were categorized as "unclear etiology."  Id. at 86.  Mr. Edge's diabetes medication was discontinued due to his abdominal pain.  Id. at 87.  During the hospital stay, MRIs of Mr. Edge's brain and cervical spine did not show any acute abnormalities.  Id. Because Mr. Edge's gait and balance had improved, doctors speculated that medications were to blame for his presentation.  Id.

On December 23, 2015, Mr. Edge presented to an emergency room to be evaluated for progressively worsening malaise, tingling back pain, sharp bilateral

shoulder pain, and burning lower abdominal pain.  Exhibit 4 at 3.  Further examinations, an abdominal ultrasound, and a chest x-ray resulted in the absence of positive findings that explained Mr. Edge's condition.  Id. at 10.

On January 4, 2016, Mr. Edge was admitted to the hospital for IVIG treatments.  Exhibit 5 at 40.  During a consultation, neurologist Nitesh Shekhadia's differential diagnosis included a questionable autoimmune disease, possible radiculomyelopathy, myelitis, or possible Guillain-Barré syndrome ("GBS") or CIDP "not very typical in presence of reflex."  Id. at 49, 54.

Mr. Edge was admitted to the hospital on January 12, 2016, due to altered mental status and other symptoms that his wife had noticed.  Exhibit 5 at 17.  Mr. Edge only complained of abdominal pain.  Id.  The impressions included possible CIDP, altered mental status (secondary to medication), constipation, and dehydration.  Id. at 9.

On February 15, 2016, Mr. Edge saw neurologist Elliot Dimberg for an examination.  Exhibit 1 at 17.  Dr. Dimberg diagnosed Mr. Edge with: 1) torso dysesthesia in the setting of diabetes and recent vaccination; 2) peripheral neuropathy likely secondary to diabetes; 3) possible left ulnar neuropathy; and 4) deconditioning (causing hip flexor weakness).  Id. at 17-18.  Dr. Dimberg further commented that "[a] post vaccination phenomenon is certainly possible, but would be difficult if not impossible to specifically prove at this time."  Id. at 18.  He discounted Mr. Edge's elevated protein levels in his spinal fluid as "spurious in the setting of diabetes" and noted Mr. Edge's lack of responsiveness to the IVIG treatment.  Id.

In April 2016, Mr. Edge began regular visits to the Rehabilitation Medical Group/Pain Relief Center.  For the remainder of 2016, Mr. Edge's complaints varied between abdominal, back, lower torso, hand, leg foot, and thoracic pain.  Exhibit 12 at 51-69.  In conjunction with these visits, Mr. Edge also began attending physical therapy.  He gained strength in different areas, but his progress was inconsistent.  Exhibit 8 at 43-66.

On January 3, 2017, Mr. Edge suffered a heart attack.  He was treated at Florida Hospital South where he eventually had a stent implanted.  Exhibit 14.4 at 374, 376.[3]

Due to shortness of breath and chest pain on February 9, 2017, Mr. Edge was re-admitted to the hospital.  Exhibit 14.4 at 355-56.  Mr. Edge's admission

---

[3] It appears that Mr. Edge did not file medical records from Florida Hospital South.

diagnoses included type 2 diabetes with neuropathy and his final diagnoses indicated he had type 2 diabetes, insulin-dependent, and peripheral neuropathy.  Id.

Throughout 2017, Mr. Edge continued seeking treatment at the Pain Relief Center.  His complaints continued to cycle through abdominal, back, lower torso, hand, leg foot, and thoracic pain.  Exhibit 12 at 8-47.

On February 5, 2018, Mr. Edge's wife brought him to an emergency room after he suffered a seizure.  Exhibit 14.4 at 90.  During his hospital stay, Mr. Edge's active problems were identified as diabetic neuropathy and type 2 diabetes mellitus.  Id. at 84.  Neurologist Dr. Ramit Panara noted Mr. Edge's diabetes mellitus but also listed "?CIDP" in the subjective section.[4]  Id. at 145.

On July 17, 2018, Mr. Edge visited an emergency room due to weakness and low blood pressure.  Exhibit 14.3 at 155.  The doctors treated Mr. Edge for dehydration.  Exhibit 14.4 at 5.  Mr. Edge's active problems were identified as diabetic neuropathy and type 2 diabetes mellitus.  Id. at 14.  The records submitted by Mr. Edge do not continue beyond this point.

## II.     Procedural History

Through his attorney, Mr. Edge alleged that he suffered CIDP as a result of an influenza and a pneumococcal vaccination.  Pet., filed Sept. 18, 2017, at 1.  Two months later, Mr. Edge filed a statement of completion.

On June 5, 2018, respondent filed a status report identifying outstanding medical records and proposing a due for his Rule 4 report.  Subsequently, Mr. Edge filed the outstanding medical records, and respondent filed his Rule 4 report. In his report, respondent opposed compensation arguing that the medical records did not establish Mr. Edge's CIDP diagnosis and that Mr. Edge had not submitted an expert opinion to support his claim.  At a status conference to discuss the report, the undersigned noted that Mr. Edge's expert opinion must distinguish the neurological injuries he has suffered from his diabetes from those injuries he has suffered from the vaccinations.  Order, issued Sept. 14, 2018.  Mr. Edge was ordered to file a status report advising whom he had retained as an expert.

---

[4] This reference to "?CIDP" in neurologist Dr. Panara's records appears in a subjective section where Dr. Panara recorded Mr. Edge's recitation of his own medical history.  Exhibit 14.4 at 145.  Moreover, Dr. Panara may have added the question mark to the CIDP notation to indicate Dr. Panara's skepticism of a CIDP diagnosis.

On October 29, 2018, Mr. Edge filed a status report indicating that he had not yet retained an expert but proposed filing an expert report by December 13, 2018. A subsequent order required Mr. Edge to identify his retained expert as soon as possible and set the expert report deadline. Order, issued Nov. 2, 2018.

On December 13, 2018, Mr. Edge's counsel, Mr. Caldwell, stated that he would not be filing an expert report and moved for a 30-day stay to allow Mr. Edge the opportunity to decide how he will proceed. The motion was granted, staying the case for 30 days and setting a deadline for a status report indicating how Mr. Edge will proceed. Order, issued Dec. 21, 2019.

On January 22, 2019, Mr. Caldwell explicitly stated in a status report that he intends to withdraw from the case and that Mr. Edge had not yet retained new counsel. Mr. Caldwell was ordered to move to withdraw as counsel within 30 days. Order, issued Jan. 23, 2019. Mr. Caldwell twice moved for an extension of time to withdraw from the case because of his inability to communicate with Mr. Edge. From the motions, it appears that Mr. Edge was not aware that Mr. Caldwell intended to withdraw from the case.

On March 27, 2019, Mr. Caldwell filed the pending motion for attorneys' fees and costs noting his intent to withdraw as counsel. In his response, the Secretary argued that the motion had not made a special showing to justify an interim award of attorneys' fees and costs but "defer[red] to the Special Master's determination as to whether there exists a reasonable basis to the claim." Resp't's Resp., filed Apr. 10, 2019, at 2. Mr. Caldwell filed a reply to provide a justification for an interim award. Pet'r's Reply, filed Apr. 17, 2019.

Subsequently, on April 25, 2019, Mr. Caldwell moved to withdraw as counsel stating that he had irreconcilable differences with Mr. Edge. Before the undersigned could act on this motion, another attorney from Mr. Caldwell's firm, Jessica Olins, inadvertently moved to substitute as Mr. Edge's counsel. The Clerk's Office automatically granted this motion to substitute. See Rule 83.1(c)(4)(A)(i)(I) of the Rules of the Court of Federal Claims. To correct her mistake, Ms. Olins also moved to withdraw as counsel.

On June 25, 2019, Ms. Olins withdrew from this case. Mr. Edge was ordered on August 9, 2019, and on September 16, 2019, to file a status report stating whether he intends to retain a new attorney and whether he intends to continue pursuing his vaccine claim. Because Mr. Edge did not file a status report in response to either order, an order to show cause issued on November 22, 2019. After a lack of response to the order to show cause, a decision issued on January

7

24, 2020, dismissing the case for failure to prosecute and insufficient proof. <u>Decision</u>, 2020 WL 836612.  Judgment was entered on February 27, 2020.

### III.        Standards for Adjudication

As an initial matter, while Mr. Caldwell did not title the March 27, 2019 motion a "motion for fees and costs on an interim basis," the motion was effectively seeking fees and costs on an interim basis because it was filed before judgment was entered.  However, now that the case has concluded and judgment has entered, the undersigned will consider Mr. Caldwell's motion to be a motion for final fees and costs.  Thus, the parties' arguments about the appropriateness of an interim award are moot.

Petitioners who have not been awarded compensation are eligible for an award of attorneys' fees and costs when "the petition was brought in good faith and there was a reasonable basis for the claim." 42 U.S.C. § 300aa—15(e)(1).  As the Federal Circuit has stated, "good faith" and "reasonable basis" are two separate elements that must be met for a petitioner to be eligible for attorneys' fees and costs.  <u>Simmons v. Sec'y of Health & Human Servs.</u>, 875 F.3d 632, 635 (Fed. Cir. 2017).

"Good faith" is a subjective standard.  <u>Id.</u>; <u>Hamrick v. Sec'y of Health & Human Servs.</u>, No. 99-683V, 2007 WL 4793152, at *3 (Fed. Cl. Spec. Mstr. Nov. 19, 2007).  A petitioner acts in "good faith" if he or she honestly believes that a vaccine injury occurred.  <u>Turner v. Sec'y of Health & Human Servs.</u>, No. 99-544V, 2007 WL 4410030, at * 5 (Fed. Cl. Spec. Mstr. Nov. 30, 2007).  The Secretary has not challenged petitioner's good faith here, and the undersigned finds that good faith exists.  Accordingly, the eligibility for an award of attorneys' fees and costs turns on the question of the reasonable basis for the petition.

Reasonable basis, in contrast, is purely an evaluation of the objective weight of the evidence.  <u>Simmons</u>, 875 F.3d at 636.  Because evidence is "objective," the Federal Circuit's description is consistent with viewing the reasonable basis standard as a test that petitioners meet by submitting evidence.  <u>See</u> <u>Chuisano v. Sec'y of Health & Human Servs.</u>, No. 07-452V, 2013 WL 6234660, at *12-13 (Fed. Cl. Spec. Mstr. Oct. 25, 2013) (explaining that reasonable basis is met with evidence), <u>mot. for rev. denied</u>, 116 Fed. Cl. 276 (2014).

In practice, it has proven difficult to define the modicum of evidence that confers reasonable basis onto a petitioner.  When the Federal Circuit and judges of the Court of Federal Claims have commented on the reasonable basis standard, they often do not speak of the amount of evidence that confers reasonable basis.

Instead, they have spoken to the types of situations where reasonable basis cannot be said to exist.  For example, a petition based purely on "unsupported speculation," even speculation by a medical expert, is not sufficient to find a reasonable basis.  Perreira v. Sec'y of Health & Human Servs., 33 F.3d 1375, 1377 (Fed. Cir. 1994) ("Congress must not have intended that every claimant, whether being compensated or not under the Vaccine Act, collect attorney fees and costs by merely having an expert state an unsupported opinion that the vaccine was the cause in-fact of the injury").  As another example, when "the medical and other written records contradict the claims brought forth in the petition," a special master is not arbitrary in concluding that reasonable basis for the petition did not exist. Murphy v. Sec'y of Health & Human Servs., 30 Fed. Cl. 60, 62 (1993), aff'd without opinion, 48 F.3d 1236 (Fed. Cir. 1995) (table).

In Simmons, a judge found petitioner's failure to submit a petition that complied with the Vaccine Act's requirements supported a finding that reasonable basis for the petition did not exist.  The judge reasoned that section 11(c) of the Vaccine Act requires that petitions "be accompanied with evidence of injury" to "ensure[] that petitioners and their counsel make some effort to establish that there was a vaccination and an injury that may be linked to the vaccine." Simmons v. Sec'y of Health & Human Servs., 128 Fed. Cl. 579, 583 (2016), aff'd, 875 F.3d 632 (Fed. Cir. 2017).

One such requirement of the Act is that special masters cannot award compensation "based on the claims of petitioner alone, unsubstantiated by medical records or by medical opinion."  42 U.S.C. § 300aa-13(a)(1).  Special masters and judges of the Court of Federal Claims have interpreted this portion of the Act to mean that petitioners must submit expert medical opinion, either contained in the form of their medical records or in the form of expert opinion testimony, to support claims of causation-in-fact.  See Waterman v. Sec'y of Health & Human Servs., 123 Fed. Cl. 564, 574 (2015) (citing Dickerson v. Sec'y of Health & Human Servs., 35 Fed. Cl. 593, 599 (1996) (referring to "the firm requirement that medical opinion evidence is ... necessary ... to support an on-Table theory" where medical records fail to establish the existence of a Table injury by a preponderance of the evidence)).

If compensation is unavailable without medical opinion supporting causation, it follows that the absence of medical opinion evidence undermines the reasonable basis of the claim.  See Mullen v. Sec'y of Health & Human Servs., 143 Fed. Cl. 504 (2019) (denying motion for review of decision finding no reasonable basis when a petitioner failed to comply with the requirements of 42 U.S.C. § 300aa-13(a)(1)).

Additionally, as establishing a diagnosis can be threshold determination before proceeding to a full causation analysis, see Broekelschen v. Sec'y of Health and Human Servs., 618 F.3d 1339, 1346 (Fed. Cir. 2010), whether a diagnosis has been established affects the reasonable basis analysis.  See McCabe v. Sec'y of Health & Human Servs., No. 13-570V, 2019 WL 4201571 (Fed. Cl. Spec. Mstr. Aug. 2, 2019) (finding no reasonable basis because, among other reasons, petitioner failed to establish that she suffered from the conditions that the vaccination allegedly caused); Bussa v. Sec'y of Health & Human Servs., No. 15-202V, 2019 WL 2635897 (Fed. Cl. Spec. Mstr. May 31, 2019) (finding reasonable basis when petitioner's expert provided an opinion supporting the condition alleged in the petition).

## IV.    **Discussion**

Mr. Edge did not present any arguments in his motion nor in his reply to establish reasonable basis.  As noted above, the Secretary did not interpose any challenges to reasonable basis.[5]  In light of the Secretary's lack of objection, the undersigned has reviewed the case for reasonable basis.  See McIntosh v. Sec'y of Health & Human Servs., 139 Fed. Cl. 238 (2018).

If petitioner had obtained a "medical opinion" supporting the claim set forth in the petition, then the analysis of reasonable basis could start there.  However, Mr. Edge did not submit a medical opinion.  Thus, as an alternative to "medical opinion," petitioner may rely upon "medical records."  See 42 U.S.C. § 300aa-13(a).

The reasonable basis discussion will focus on whether some evidence establishes the reasonable basis for (1) Mr. Edge's claim that he suffered from CIDP and (2) Mr. Edge's claim that the vaccinations caused his CIDP.  These issues will be discussed together because Mr. Edge's treating physicians were often attempting to diagnose Mr. Edge while contemporaneously considering whether the vaccinations contributed to his condition.

Ample evidence shows that before vaccination, Mr. Edge suffered from diabetes.  During his August 2015 hospital admission, one impression of Mr. Edge

---

[5] The lack of briefing from the parties is unfortunate.  However, the consequence of the lack of briefing falls on Mr. Edge and his attorney because "a petitioner must affirmatively establish a reasonable basis to recover attorneys' fees and costs."  Simmons, 128 Fed. Cl. at 583, quoting Chuisano v. Sec'y of Health & Human Servs., 116 Fed. Cl. 276, 287 (2014).

was diabetes mellitus with neuropathy.  Exhibit 5 at 128, 131.  At subsequent appointments in September 2015, Mr. Edge complained of ongoing neuropathy pain, absent or reduced reflexes, and absent or reduced sensation.  Exhibit 3 at 10-12, 19-21.  The impression of Mr. Edge continued to include diabetes mellitus with peripheral sensory neuropathy.  Id. at 21.  Through Mr. Edge's own statements and the pre-vaccination medical history, Mr. Edge clearly was suffering from neurologic symptoms due to his diabetes mellitus at this time.  In accord with these medical records, Mr. Edge's petition asserted that before the vaccinations, he had "ongoing diabetes-related neuropathy."  Pet. at 1.

While receiving care for his diabetes, Mr. Edge received the allegedly causal vaccinations on two different dates.  He received the influenza vaccine on October 2, 2015.  Exhibit 9 at 28-29; exhibit 6 at 1.  On November 2, 2015, Mr. Edge received the pneumococcal vaccine.  Exhibit 9 at 23.

Mr. Edge claims that he suffered from CIDP following the vaccinations.  Pet. at 1.  In the three weeks following the pneumococcal vaccination on November 2, 2015, Mr. Edge reported worsening of pain in different areas of his body, including his abdomen.  Exhibit 5 at 92.  During a hospital stay for this worsening pain, imaging revealed that Mr. Edge had pneumonia.  Id. at 95.  One doctor at the hospital, Dr. Stephen Young, "doubt[ed] that the symptoms [are] secondary to vaccine reaction."  Id. at 91.  Beyond pneumonia, an infectious disease specialist at the hospital, Santiago Calderon, indicated a "high suspicion for the neuropathy likely related to his diabetes," and "suspected possibility of reaction to pneumonia vaccination."  Id. at 99.

In the hospital, Mr. Edge saw Sampathjumar Shanmugham, a neurologist.  Dr. Shanmugham opined that Mr. Edge's peripheral neuropathy was "most likely due to diabetes mellitus."  Exhibit 5 at 97.  He added that "preexisting diabetic neuropathy can get worse after any type of peripheral nerve insult, but [Mr. Edge] does not have ascending symptomatology to suggest that."  Id.  MRIs of Mr. Edge's brain and cervical spine did not show any acute abnormalities.  Id. at 87.

Thus, by his discharge on November 26, 2015, doctors listed eight "final diagnoses."  Of these eight, the following are potentially relevant:

1. Intractable upper and lower back pain of unclear etiology.

2. Gait abnormality with unsteadiness, perhaps associated [with] untoward effect of medication.

5. Diabetes mellitus with neuropathy.

11

7.  Hyperlipidemia.  Paraesthesias perhaps associated to the Pneumovax vaccination.

Exhibit 5 at 85.  It appears that no doctor had diagnosed Mr. Edge as suffering from CIDP.

Regarding the cause of Mr. Edge's problems, the doctors offered many possibilities.  While Dr. Calderon "suspected [a] possibility of [a] reaction to pneumonia vaccination," Dr. Calderon also had a "high suspicion for a neuropathy likely related to his diabetes."  Id. at 99.  Dr. Calderon's ambiguous statement does not carry Mr. Edge's burden to establish a reasonable basis for the petition's claim that the vaccination caused him to suffer CIDP, especially because another treating doctor "doubt[ed] that the symptoms [are] secondary to vaccine reaction."  Id. at 91.  Further, the author of the discharge summary noted that Mr. Edge "also raised the possibility of demyelinating condition such as like an allergic encephalomyelitis which could happen after vaccination, but no signs were consistent during the examination."  Id. at 86.

Mr. Edge's allegation that he suffered from CIDP was slightly stronger after one of his appointments in January 2016.  Then, neurologist Nitesh Shekhadia offered a broad differential diagnosis including a questionable autoimmune disease, possible radiculomyelopathy, myelitis, "GBS or CIDP."  Exhibit 5 at 49.  Dr. Shekhadia's listing of CIDP appears to be the first time a doctor considered this possible diagnosis.  However, Dr. Shekhadia's list does not advance Mr. Edge's claim very far as Dr. Shekhadia, after a physical examination, concluded that CIDP was "not very typical in presence of reflex."  Id. at 54.  Mr. Edge received IVIG treatments while at the hospital.  Id. at 40.

At this point, many of the specialists treating Mr. Edge had attributed his post-vaccination neurologic symptoms to his diabetes mellitus and rested on that diagnosis.  See exhibit 5 at 97 (Dr. Shanmugham); exhibit 5 at 99 (Dr. Calderon).  Some of specialists had openly doubted a vaccine connection to the post-vaccination symptoms.  See exhibit 5 at 91 (Dr. Young).  A few specialists kept open the possibility of a vaccine connection to the post-vaccination symptoms and a CIDP (or related neurologic condition) diagnosis in addition to diabetes mellitus.  See exhibit 5 at 49 (Dr. Shekhadia).  Notably, Mr. Edge was prescribed IVIG treatments, a therapy to treat immune disorders, to determine if his neurologic symptoms were immune related.  Exhibit 5 at 40.

On February 15, 2016, Mr. Edge saw neurologist Elliot Dimberg for an examination.  Exhibit 1 at 17.  Commenting on the evidence related to immune disorders, Dr. Dimberg discounted Mr. Edge's elevated protein levels in his spinal

fluid as "spurious in the setting of diabetes" and noted Mr. Edge's lack of responsiveness to the IVIG treatment.  Id.  Dr. Dimberg diagnosed Mr. Edge with: 1) torso dysesthesia in the setting of diabetes and recent vaccination; 2) peripheral neuropathy likely secondary to diabetes; 3) possible left ulnar neuropathy; and 4) deconditioning (causing hip flexor weakness).  Id. at 17-18.  Dr. Dimberg further opined that "[a] post vaccination phenomenon is certainly possible, but would be difficult if not impossible to specifically prove at this time."  Id. at 18.  While Mr. Edge continued to pursue pain management and physical therapy, it does not appear that his doctors attempted any further immune therapies.

Up through the filing of the petition in late 2017, Mr. Edge's current condition was consistently categorized as diabetes with neuropathy (or a similar variant).  Mr. Edge was not formally diagnosed with CIDP.

Beginning with his hospitalization on August 28, 2015, which was the first time Mr. Edge sought medical attention in ten years, doctors associated many health problems with his diabetes.  The presence of diabetes complicates a petitioner's attempt to link any neuropathic problems with a vaccination because diabetes can cause neuropathies.  See McElroy v. Sec'y of Health & Human Servs., No. 17-1083V, 2019 WL 5788320 (Fed. Cl. Spec. Mstr. Oct. 11, 2019) (finding no reasonable basis support the claims set forth in the petition when petitioner failed to obtain an expert report and treating doctors suggested that petitioner suffered from diabetic neuropathy).

Any initial suspicions of vaccine causation and/or a CIDP diagnosis in 2015 faded.  By early 2016, Mr. Edge's doctors had conducted enough tests and explored enough treatments to stop giving Mr. Edge immune therapies and considering a link with the vaccinations.  Mr. Edge was never formally diagnosed with CIDP, and CIDP was no longer listed among impressions of Mr. Edge or his active conditions in the medical records.

Before filing the petition on September 18, 2017, Mr. Caldwell possessed evidence attributing Mr. Edge's neurologic symptoms to his diabetes and failing to maintain a CIDP diagnosis.  Pet'r's Fees Motion, exhibit 17 at 4 (timesheets).  The most recent medical record cited in the petition is a January 4, 2016 appointment. Pet. at 1-2 (citing exhibit 5 at 40).  Neither the petition nor the motion for attorneys' fees and costs address any of Mr. Edge's subsequent seventeen months of medical history until the filing of the petition.  These months of medical history lend no support to the minimal evidence in support of vaccine causation and/or a CIDP diagnosis that had accrued by January 2016.

The undersigned finds that Mr. Edge did not establish a reasonable basis for his asserted CIDP diagnosis or a reasonable basis for a logical sequence of cause and effect between the vaccinations and his post-vaccination symptoms.

## V.      Conclusion

Here, the evidence does not establish that Mr. Edge had a reasonable basis for the claim set forth in the petition.  Because it is petitioner's burden to establish such a reasonable basis before an award of attorneys' fees and costs can be made, the undersigned finds that petitioner's motion for attorneys' fees and costs must be DENIED.

In the absence of a motion for review filed pursuant to RCFC Appendix B, the clerk of the court is directed to enter judgment herewith.  Furthermore, the Clerk's Office is instructed to email a copy of the decision to Ms. Olins, former counsel of record for Mr. Edge.

**IT IS SO ORDERED**.

*Christian J. Moran*

Christian J. Moran
Special Master